

**U.S. Department of Justice**

_United States Attorney_
_Eastern District of New York_

SLT:MEL                                      _271 Cadman Plaza East_
F.#1999R02499                                _Brooklyn, New York 11201_


April 2, 2015


To Be Filed Under Seal


The Honorable Edward R. Korman
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York  11201


      Re:    United States v. Lucindo Otilio Placencia Lopez
               Criminal Docket No. 99-1137 (S-1) (ERK)


Dear Judge Korman:

        The government respectfully submits this letter in response to the Court's February 25, 2015 Order, directing the government to show cause as to why the defendant is not entitled to a sentence reduction under 18 U.S.C. § 3582(c).  For the following reasons the defendant is not entitled to a sentence reduction.


Background


        As set forth in the Presentence Investigation Report ("PSR"), in the late 1990s, the Drug Enforcement Administration ("DEA") and New York City Police Department ("NYPD") were investigating a violent organization involved in the manufacture and distribution of cocaine base, or crack cocaine, in the East New York section of Brooklyn, New York.  (Presentence Investigation Report ("PSR") ¶ 2.)  The joint task force received information from a confidential informant that the leader of this organization was the defendant, and that his "right-hand man" was Mario Placencia, the defendant's brother-in-law.  Id.  According to the informant, the defendant's organization obtained kilogram quantities of cocaine from unknown suppliers of Colombian citizenship, and processed the cocaine into crack and packaged it for sale in retail quantities at store fronts in East New York, known as "spots."  Id.  At various periods between 1997 and 1999, the defendant and Placencia operated between 15 to 20 spots, with several in operation at one time.  Id.  The spots operated 24-hours per day, with two 12-hour shifts.  Id.  The packages that were sold weighed an estimated two grams each and sold for $5 per bag and were contained in plastic bags.  Id.  During a 24-hour period, between $1,000 and $10,000 worth of crack-cocaine

(representing between 26 grams and 260 grams) was sold from each spot.  Id.  In particular, from 1998 through 1999, the organization operated spots at the following locations in Brooklyn: 112 Jamaica Avenue; 104 Jamaica Avenue; 2978 Fulton Street; 3221 Fulton Street; 3237 Fulton Street; 3239 Fulton Street; and 3428 Fulton Street.  Id.

        Agents learned from the confidential informant that the store fronts to most of the spots had small plexiglass windows through which the crack-cocaine was sold.  (PSR ¶ 3.)  The windows were usually surrounded by a large metal plate and the entrance covered with a metal gate and secured by a padlock.  Id.  Access to the interior of the spot was obtained only by unlocking the padlock and raising the gate.  Id.  The defendant was assisted by individuals in the organization, who served in a variety of roles, which included sellers or "pitchers," who sold the crack cocaine through the plexiglass windows, while locked inside the spots for 12-hour shifts.  Id.  The defendant and Placencia primarily hired unknown individuals who were addicted to crack cocaine and living on the street to act as the sellers.  Id.  Between the fall of 1998 and December 1999, the DEA and the NYPD conducted physical surveillance at seven spots in Brooklyn operated by the defendant's organization, including three of the spots identified by a confidential informant.  Id. at ¶ 4.  During this period, agents and detectives observed multiple hand-to-hand drug transactions occurring through the windows at the spots.  Id.  Agents also conducted video surveillance at the spots, monitoring a closed circuit television camera at 112 Jamaica Avenue in Brooklyn, New York, between January 22, 1999, and February 9, 1999.  Id.  Agents established a second closed-circuit television camera outside 3239 Fulton Street, which recorded activities in front of that spot and the 3237 Fulton Street spot.  Id.  A review of the video tapes from these cameras also revealed numerous hand-to-hand narcotics transactions.  Id.  As an example, between January 22, 1999, and February 8, 1999, at least 30 hand-to-hand transactions that occurred daily at the window at 112 Jamaica Avenue were recorded.  Id.

        During the course of the investigation, an undercover operation was initiated during which NYPD undercover officers, posing as narcotics customers, purchased crack cocaine from six of the defendant's spots on multiple occasions.  (PSR ¶ 5.)  Thereafter, search warrants were executed at the spots where the DEA and NYPD seized items including numerous plastic bags containing crack cocaine, drug paraphernalia, United States currency, ledgers reflecting narcotics transactions, and names and telephone numbers of members of the defendant's organization.  Id.  In addition, several individuals were arrested at the spot in possession of crack cocaine.  Id.  The defendant operated one of the spots at 112 Jamaica Avenue (hereinafter "Interboro") from 1998 through April 7, 1999, when it was closed by the NYPD.  Id. at ¶ 6.  During this period, the spot was managed at various times by Noel Reyes, and the first and second confidential witnesses.  Id.  On numerous occasions, an NYPD undercover officer purchased crack cocaine at the spot.  Id.  On February 25, 1999, DEA agents and NYPD officers executed a search warrant at the spot, and seized 150 plastic bags, containing 23 grams of 81% pure crack cocaine, and books and ledgers reflecting narcotics transactions and the names of those individuals involved.  Id.  On April 7, 1999, DEA agents and NYPD officers executed a second warrant at this spot, and recovered 17 plastic bags of crack-cocaine, weighing 3 grams.  Id.  Additionally, the defendant operated a drug spot at 104 Jamaica Avenue (hereinafter "Mini-Deli") in Brooklyn, New York, between April 1999

and June 5, 1999, when it was destroyed by fire.  Id. at ¶ 7.  The managers of the spot included Reyes and Pedro Camacho.  During its operation, NYPD undercover officers purchased crack cocaine at the spot on several occasions.  Id.  The 2978 Fulton Street spot (hereinafter "Elton") was operated by the defendant between 1998 and December 2, 1999. At various points, the managers of this spot included Juan Lima and Placencia.  Id. at ¶ 8. During this period, the NYPD conducted several undercover purchases of crack cocaine.  Id. On one occasion, on August 11, 1999, the DEA and NYPD executed a search warrant at Elton, recovering narcotics ledgers and 51 bags of crack-cocaine weighing 10 grams.  Id.

     The defendant also operated a spot located at 3237 Fulton Street (hereinafter "Hernandez") in Brooklyn on various occasions between April 1, 1999, and December 2, 1999.  (PSR ¶ 10.)  On April 1, 1999, NYPD officers seized 89 grams of crack cocaine from the Hernandez spot and arrested a number of individuals in possession of the drug.  Id.  The defendant also operated a spot at 3239 Fulton Street (hereinafter "Chestnut") in Brooklyn. Id. at ¶ 11.  This spot was operated by the defendant from the fall of 1998 through April 1999, when it was closed by the NYPD.  Id.  Undercover NYPD officers purchased crack cocaine from the spot on many occasions, and on January 28, 1999, officers executed a search warrant at the spot, seizing 386 plastic bags of crack cocaine, weighing 77 grams.  Id. On April 1, 1999, DEA agents and the NYPD executed a search warrant at the spot, and seized narcotics records and an additional 60 plastic bags of crack cocaine weighing 12 grams.  Id.  Between May 1999 and August 1999, the defendant operated a spot at 3221 Fulton Street (hereinafter "R&M") in Brooklyn, New York.  Id. at ¶ 9.  After the Chestnut spot was closed by the NYPD in April 1999, two co-conspirators, who had managed the spot, began managing R&M.  Id.  While the R&M spot was in operation, agents and officers observed hand-to-hand transactions occurring at the window in front of the spot and made a number of undercover purchases of crack cocaine.  Id.  On August 11, 1999, the DEA and NYPD executed a search warrant at 3221 Fulton Street, and seized 37 plastic bags of crack cocaine weighing 7 grams.  Id.

     Additionally, the defendant operated a spot at 3428 Fulton Street (hereinafter "Argentina") in Brooklyn, between March 1999 and the December 2, 1999.  (PSR ¶ 12.) After the Mini-Deli spot was destroyed by fire, Camacho, who managed the spot at the time, became Argentina's manager.  Id.  On August 11, 1999, the DEA and NYPD executed a search warrant at the Argentina spot, during which officers and agents seized books, records, and 87 plastic bags of crack-cocaine, weighing 17 grams.  Id.  On October 20, 1999, the NYPD executed a third warrant and seized 20 bags of crack cocaine weighing 4 grams.  Id. As set forth in the PSR, the DEA and NYPD seized a total of 242 grams of crack cocaine.  In addition, one of the confidential witnesses, who worked as a manager of the Interboro spot from December 1998 to February 1999, indicated that he would deliver crack cocaine, which was provided by either the defendant or Placencia, to the spot.  Id. at ¶ 15.  The witness would collect the narcotics proceeds and deliver them to the defendant.  Id.  On one occasion during this period, the witness was instructed to deliver a bundle of 40 grams of crack cocaine to the Interboro spot.  Id. at ¶ 16.  After providing the defendant with the proceeds from this bundle, he was subsequently provided with three bundles of crack cocaine, weighing approximately 240 grams, to provide to the Interboro spot for sale.  Id.  On another

occasion the witness received five bundles of crack cocaine from the defendant's wife for sale at the Interboro spot. Id. at ¶ 17. Each bundle weighed approximately 40 grams for a total approximate weight of 200 grams. Id. The witness received crack cocaine from the defendant on multiple other occasions, usually receiving bundles worth approximately $1,000, or approximately 40 grams, for sale at the spot. Id. at ¶ 18. The witness also received bundles of crack from Placencia. Id. at ¶ 24. On at least two occasions in 1998, Placencia provided the witness with 80 grams of crack cocaine to sell at Interboro. Id.

A second confidential witness was employed by the defendant's drug organization from 1995 until his arrest. (PSR ¶ 19.) In 1998, this witness managed the Interboro spot. Id. In January 1999, the witness was assigned to deliver crack cocaine to the spot managers and collect proceeds from them. Id. During this period, the witness went to the spots twice per day and collected between $1,000 and $4,000 in United States currency per 12-hour shift, and delivered the proceeds to the defendant. Id. at ¶ 20. Additionally, the witness provided the defendant with the paperwork reflecting the amount of crack cocaine delivered to the spots, the drug quantities sold at the spots, and the amount of money paid from each spot to cover the organization's expenses, such as the salaries of the managers, sellers and look-outs. Id. According to the second confidential witness, the defendant frequently conducted meetings with the managers of the spots. Id. During those meetings, the defendant told the managers to maintain sales at the spots and watch out for robbers who tried to steal drugs from the locations. Id. The defendant also informed them that they should beat those sellers who stole drugs or cash from his organization. Id. The defendant personally informed the confidential witness that those who had stolen from the organization in the past had been beaten. Id. Since the defendant frequently hired homeless drug-dependent individuals to sell drugs at the spots, it was common for the sellers to partake of the drugs while locked inside the spots for 12-hour shifts. Id. Furthermore, the cooperators described a practice which the defendant referred to as "dancing," whereby errant workers were taken to a remote beach location and physically beaten by the defendant's managers. Id. The defendant and Placencia instructed that the beatings occur at a nearby beach rather than at the spots, in order to avoid attracting attention from police. Id.

The first confidential witness informed agents that the defendant received at least five kilograms of cocaine from his suppliers. (PSR ¶ 21.) The second confidential informant estimated that the defendant profited in the amount of $40,000 per kilogram of cocaine after he processed it into crack and sold it in the latter form. Id. The second witness also estimated, based on his observations of the activity at the defendant's spots, that the defendant earned approximately $170,000 per week from the Chestnut, Interboro, and Elton spots, combined. Id. On December 2, 1999, the DEA and NYPD seized 917.5 grams of crack cocaine from the defendant's home and 100 grams of cocaine. Id. at ¶ 27. Agents also seized various drug paraphernalia, including cooking equipment and a scale, as well as a loaded .9 millimeter pistol. Id. That same day, during a search of Placencia's home, agents seized an additional 9.2 grams of crack cocaine. Id. at ¶ 28.

As detailed in the PSR, the defendant engaged in numerous acts of violence, in furtherance of his drug-trafficking business. (PSR ¶¶ 22–23.) Specifically, on July 7, 1998,

4

the defendant and his bodyguard, Andre Pena, became engaged in an altercation with James Gomez.  Id. at ¶ 22.  As Pena pursued Gomez, Gomez shot Pena multiple times.  Id.  Although Pena was unable to return fire because his gun jammed, he was able to tackle Gomez and beat him severely with his 9 millimeter pistol.  Id.  Police found Gomez bleeding profusely from head injuries.  Id.  In another incident, on December 19, 1998, the defendant and two co-conspirators were robbed while they were cooking crack cocaine.  Id. at ¶ 23.  The defendant and the two others chased the robbers, firing their guns at them.  Id.  The robbers were able to escape.  Id.

On October 19, 2000, the defendant pled guilty to Count 15 of the superseding indictment, which charged the defendant with possession with intent to distribute cocaine base, in violation of Title 12, United States Code, Sections 841(a)(1) and 841(b)(1)(C). (PSR ¶ 1.)  At sentencing, the defendant was held accountable for more than 1.5 kilograms of cocaine base distributed by his drug-trafficking organization, resulting in a base offense level of 38.  Id. at ¶ 77.  The defendant received a two-level enhancement because he possessed a dangerous weapon during the offense, a four-level enhancement as an organizer and a three-level reduction for acceptance of responsibility.  Id. at ¶¶ 28, 80.  Accordingly, the defendant's total offense level was 41 and, with a criminal history category of III, his Guidelines range was 360 months to life in custody.  Id. at ¶ 119.  However, because the statutory maximum for his count of conviction was 240 months, his effective Guidelines range was 240 months.  Id.  The defendant received a sentence of 240 months in custody and 3 years of supervised release.  (Judgment at 2–4.)

On November 16, 2011, the defendant filed a motion pursuant to 18 U.S.C. § 3582 for resentencing based on the retroactive amendments to the crack cocaine sentencing guidelines.  (Docket No. 361.)  This Court denied the defendant's motion, finding that even if the defendant were eligible for a two-point reduction, his Guidelines range would be 262 to 327 months, and, since he was sentenced to 240 months, he would not be eligible for a reduction.  (Docket No. 389, Aug. 1, 2013 Memorandum & Order 2–3.)

<u>Argument</u>

Amendment 782 of the Guidelines, effective November 1, 2014, lowers the penalties for most drug offenses by reducing many of the offense levels in the Drug Quantity Table in § 2D1.1 by two levels and making related adjustments.  Amendment 788 of the Guidelines states that Amendment 782 may be applied retroactively to lower the sentences of previously sentenced inmates.  This authority derives from 18 U.S.C. § 3582(c)(2), which provides:

> [I]n the case of a defendant who has been sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered by the Sentencing Commission pursuant to 28 U.S.C. 994(o), upon motion of the defendant or the Director of the Bureau of Prisons, or on its own motion, the court may reduce the term of imprisonment, after considering the factors

> set forth in section 3553(a) to the extent that they are applicable,
> if such a reduction is consistent with applicable policy
> statements issued by the Sentencing Commission.

18 U.S.C. § 3582(c)(2).  In § 1B1.10 of the Guidelines, the Sentencing Commission
articulated the proper procedure for implementing an amendment in a concluded case.  In
<u>Dillon v. United States</u>, 130 S. Ct. 2683, 2691 (2010), the Supreme Court discussed this
procedure and emphasized that § 1B1.10 is binding on district courts in § 3582(c)
proceedings.  The Court affirmed a two-step approach for district courts to follow:

> At step one, § 3582(c)(2) requires the court to follow the
> Commission's instructions in § 1B1.10 to determine the
> prisoner's eligibility for a sentence modification and the extent
> of the reduction authorized.   Specifically, § 1B1.10(b)(1)
> requires the court to begin by "determin[ing] the amended
> guideline range that would have been applicable to the
> defendant" had the relevant amendment been in effect at the
> time of the initial sentencing.  "In making such determination,
> the court shall substitute only the amendments listed in
> subsection (c) for the corresponding guideline provisions that
> were applied when the defendant was sentenced and shall leave
> all other guideline application decisions unaffected."  <u>Id.</u>
>
> Consistent with the limited nature of § 3582(c)(2) proceedings,
> § 1B1.10(b)(2) also confines the extent of the reduction
> authorized. Courts generally may "not reduce the defendant's
> term of imprisonment under 18 U.S.C. § 3582(c)(2) . . . to a
> term that is less than the minimum of the amended guideline
> range" produced by the substitution.  § 1B1.10(b)(2)(A). . . .
>
> At step two of the inquiry, § 3582(c)(2) instructs a court to
> consider any applicable § 3553(a) factors and determine
> whether, in its discretion, the reduction authorized by reference
> to the policies relevant at step one is warranted in whole or in
> part under the particular circumstances of the case.

<u>Dillon</u>, 130 S. Ct. at 2691–92.

Here, the defendant is not eligible for a sentence reduction because
Amendment 782 does not change his Guidelines range.  Amendment 782 raised all of the
quantities subject to level 38, including the amount of cocaine base, which is now 25.2
kilograms or more.  Here, as set forth in the addendum to the PSR, the defendant was a
leader of a violence criminal organization that sold between 2 and 12 kilograms of crack

cocaine a week in Brooklyn, New York from 1996 until 1999.[1]  (PSR Add. 1.)  Accordingly, the defendant is responsible for the distribution of well in excess of 25.2 kilograms of cocaine base.  PSR ¶¶ 6, 23.

In his motion, the defendant claims that the Probation Department is somehow bound by its prior statement that the defendant was responsible for 1.5 kilograms or more of cocaine base.  (Def. Mot. 2) ("The Court held that Probation did not calculate a higher amount.  They might have.  They did not.  They are stuck with the earlier finding." (emphasis in original).)  However, the defendant misstates the record.  In the original PSR, Probation found that the defendant was responsible for selling between 2 and 12 kilograms of crack cocaine a week for a three-year span.  (PSR ¶ 77.)  In determining the base offense level, Probation stated that the defendant was responsible for significantly more than 1.5 kilograms of cocaine base "since the amount of cocaine base alone (excluding the kilogram-quantities of cocaine distributed by the organization) surpassed 1.5 kilograms of cocaine base."  (PSR ¶ 3.)  In a December 7, 2011 addendum, Probation again noted that the defendant was a leader in a violent criminal organization that sold between 2 and 12 kilograms of crack cocaine per week in Brooklyn from 1996 until 1999.  (2011 Addendum at 1.)  In denying the defendant's first resentencing motion, the Court noted that "[b]ecause [1.5 kilograms of cocaine base] triggered the maximum guideline range the Probation Department did not calculate the actual amount for which the defendant was responsible, although it seems clear that given his role as the leader and the organizer of the Lopez organization, which trafficked in far greater amounts over a considerable period of time, that he was responsible for much more."  (Memorandum & Order 1.)  The facts as set forth in the PSR, which the defendant did not object to at sentencing, clearly establish that he is responsible for distributing well in excess of 25.2 kilograms of cocaine base.  As a result the defendant's Guidelines range is unchanged, and he is not entitled to a sentence reduction.

---

[1] The defendant claims that the addendum misstates the prior PSR.  (Def. Mot. 3.)  However, the PSR specifically states that the defendant's organization was responsible for selling 2 to 12 kilograms of crack cocaine on a weekly basis between 1996 and 1999.  (PSR ¶ 38.)

<u>Conclusion</u>

For the foregoing reasons, the government respectfully submits that the defendant is not eligible for a sentence reduction.

Respectfully submitted,

LORETTA E. LYNCH
United States Attorney

By:    _____/s/_____
Margaret Lee
Assistant U.S. Attorney
(718) 254-6205

cc:    Peter Kirchheimer, Esq. (by Email)